**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

IN RE APPLICATION OF **JULIO MIGUEL ORLANDINI-AGREDA** AND **COMPAÑÍA MINERA ORLANDINI LTDA.** FOR AN ORDER TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Case No. _____

**DECLARATION OF DAVID M. ORTA IN SUPPORT OF PETITION FOR DISCOVERY IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**

Pursuant to 28 U.S.C. § 1746, I, David M. Orta, hereby declare under penalty of perjury that the following is true and correct:

1.      I am a partner in the law firm of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), which represents Petitioners Julio Miguel Orlandini-Agreda and Compañía Minera Orlandini Ltda. in connection with the Petition and also in connection with a forthcoming international investment treaty arbitration against the Plurinational State of Bolivia ("Bolivia"). I submit this declaration in support of the Petition for Discovery in Aid of a Foreign Proceeding Pursuant to 28 U.S.C. § 1782. True and correct copies and translations of all exhibits cited below are attached to this declaration.

**The Parties**

2.      Julio Miguel Orlandini-Agreda is a U.S. citizen residing in Miami, Florida. He is one of the claimants in the forthcoming arbitration against Bolivia.

3.      Compañía Minera Orlandini Ltda. ("CMO") is a mining company organized and existing under the laws of Bolivia. Mr. Orlandini is the majority owner of CMO.

4.      Gonzalo Daniel Sánchez de Lozada Sánchez Bustamante ("Sánchez de Lozada") resides in this district.  Upon information and belief, he currently resides at 4425 36th Street North, Arlington, Virginia, 22207-4514.

5.      Sánchez de Lozada founded Compañía Minera del Sur S.A. ("COMSUR") in 1962, was president of COMSUR until 1982, and was COMSUR's majority owner until he sold it to Glencore International AG or one of its subsidiaries in late 2004 or early 2005 for approximately $220 million.  Ex. A, R. East & R. Thomas, *Bolivia*, PROFILES OF PEOPLE IN POWER: THE WORLD'S GOVERNMENT LEADERS, pp. 59-60; Ex. B, *Tin soldiers: The political vendetta behind another nationalisation*, THE ECONOMIST, Feb. 15, 2007; Sánchez de Lozada was also the President of Bolivia from August 1993 to August 1997 and from August 2002 to October 2003.  Ex. C, *Bolivia (1917-present)*, UNIVERSITY OF CENTRAL ARKANSAS, pp. 7-8.

**Background**

6.      CMO was formed in 1964 as a mining company and acquired over forty mining concessions in Bolivia.  Two of those concessions were located in Municipality of  "Antequera" and the rest were in an area called "Totoral" located in the Municipality of Pazña.

7.      CMO's two concessions in Antequera were named Veneros San Juan and Pretoria. *See* Ex. D, Map of Concessions.  These concessions were surrounded to the north and south by concessions called the "Bolívar mine concessions," which belonged to Corporación Minera de Bolivia ("COMIBOL"), Bolivia's state-owned mining company.  *See id.*   COMIBOL's concessions were operated by COMSUR as COMIBOL's partner in a public-private joint venture from 1993 to 2005.  *See* Ex. E, p. 7, COMIBOL Letter (January 10, 2001).

8.      In 1997, COMIBOL applied for and was granted a new concession named "Seguridad I."  The Seguridad I concession overlaid CMO's pre-existing mining concessions

Veneros San Juan and Pretoria. Its purpose, according to COMIBOL, was to secure the joint venture's mining operations in the area. *See* Ex. E, p. 7. At COMSUR's behest, the Seguridad I concession was formally incorporated as part of the Bolivar mine concessions in 2001 through an addendum to the joint venture agreement between COMIBOL and COMSUR. *See* Ex. E, p. 1, COMIBOL Resolution (Aug. 21, 2001).

9.    Under Bolivian law, pre-existing concessions enjoy exclusive priority over later-granted concessions. *See* Bolivian Mining Code of 1997, Article 33. Therefore, a concession holder who is granted a new mining concession must fully respect pre-existing mining rights to the extent of any overlap. New concessions cannot and do not erase the pre-existing mining rights held by prior concession holders. Thus, CMO's mining rights remained intact notwithstanding the granting of the Seguridad I concession to COMIBOL.

10.    In 1999, COMIBOL and COMSUR approached Mr. Orlandini (CMO's principal shareholder) to negotiate an easement through CMO's concessions in Veneros San Juan and Pretoria. They informed CMO that they wanted to build galleries in the depths of CMO's concessions to connect and transport minerals between their concessions to the north and south of CMO's. The negotiations were not successful.

11.    CMO later learned that COMIBOL and COMSUR were illegally entering and extracting minerals from CMO's Veneros San Juan and Pretoria concessions. Furthermore, COMSUR illegally utilized CMO's concessions as a right of way through which it transported minerals mined from COMIBOL's concessions without paying a right-of-way charge to CMO. CMO wrote letters, held meetings, and even pursued criminal complaints before the Bolivian courts to stop COMIBOL and COMSUR/Sinchi Wayra from illegally extracting minerals from CMO's concessions. *See* Ex. F, Letter from CMO to COMIBOL (Nov. 25, 2004); Ex. G, Email

from Mr. Orlandini to Ms. Grenacher (Apr. 2, 2006).  Nevertheless, none of CMO's efforts to stop the illegal incursions and mining—neither with COMIBOL or COMSUR nor before the Bolivian legal system—were successful.  COMIBOL and COMSUR even prevented CMO from accessing its own Veneros San Juan and Pretoria concessions.

12.     In late 2004 or early 2005, Sánchez de Lozada sold COMSUR to Glencore International AG for about $220 million.  Ex. B, p. 2; Ex. H, U.S. Geological Survey, *2004 Minerals Yearbook: Bolivia*, p. 3.5; Ex. I, Jorge Espinoza Morales, *Minería boliviana*, p. 223 (2010).  Glencore changed COMSUR's name to Sinchi Wayra in 2005.  Ex. I, Jorge Espinoza Morales, *Minería boliviana*, p. 223 (2010); Ex. J, U.S. Geological Survey, *2005 Minerals Yearbook: Bolivia*, p. 3.3.  Prior to the sale transaction, COMSUR was fully owned by Iris Mines & Metals S.A., which in turn was owned by Minera S.A., an international mining holding company founded in 1962 in Panama; and Kempsey S.A. and Shattuck Trading S.A., both companies incorporated in Panama.  Ex. K, IFC Disclosure; Ex. L, *Minera S.A.*, KSL MINING.  Iris Mines & Metals S.A. held 99.89% of COMSUR's stock, and Kempsey S.A. and Shattuck Trading S.A. owned 0.11%.

13.     Prior to selling COMSUR to Glencore, Sánchez de Lozada owned and controlled both Minera S.A. and Iris Mines & Metals S.A.  Ex. M, *Orígenes Del Gonismo*, GONISMO: DISCURSO Y PODER; Ex. N, *Orvana Announcement* (Mar. 4, 2002).  Sánchez de Lozada is currently employed at Minera S.A. as chairman.  Ex. O, *Company Overview of Minera S.A.*, BLOOMBERG (2017).  Glencore purchased Iris Mines & Metals S.A. from Minera S.A. and thus became the major shareholder of COMSUR itself at the beginning of 2005.  Ex. P, *Orvana Announcement* (Feb. 10, 2005); Ex. Q, *Glencore advances with Minera Aguilar takeover*, BN AMERICAS (Apr. 18, 2005); Ex. R, *Una Poderosa Minera Activa de Bolsa*, NUEVAECONOMIA (July 13, 2008).  Iris

Mines & Metals S.A. now owns 99.89% of Sinchi Wayra.  Ex. S, "Patrimonio Autónomo Sinchi Wayra," *Pacific Credit Rating* Report (2017), p. 17.  Sometime between 2004 and 2006, Glencore also purchased Kempsey S.A. and Shattuck Trading S.A., which together held a 0.11% interest in COMSUR.  After purchasing the three companies, Glencore was the sole owner of COMSUR, which it renamed as Sinchi Wayra S.A., and became the operator of the Bolivar mine concession under COMSUR's existing joint venture agreement with COMIBOL.  In 2013, Sinchi Wayra assigned the joint venture agreement to Sociedad Minera Illapa S.A. (another subsidiary of Glencore).

14.     After the sale of COMSUR to Glencore, the Bolivian government implemented a series of illegal measures that papered over the illegal mining that COMSUR had conducted and dispossessed CMO of its mining concessions, property, and all attendant rights.

15.     Due to these events, CMO has not had access to the Veneros San Juan and Pretoria concessions for many years, and CMO does not have complete data on the minerals that have been extracted from the Veneros San Juan and Pretoria concessions.

**The Arbitration**

16.     Quinn Emanuel is preparing to initiate an international investment treaty arbitration on behalf of Petitioners against Bolivia based on its illegal measures under the bilateral investment treaty between the United States and Bolivia (the "U.S.-Bolivia BIT") in the very near future, and the arbitration therefore is "in reasonable contemplation" and qualifies under Section 1782. Petitioners will be the claimants in the arbitration and thus are "interested persons" under Section 1782.

17.     In the arbitration, Petitioners will claim significant damages for governmental actions through which Bolivia has violated its obligations to CMO and Mr. Orlandini, including the expropriation of CMO's mining concessions and other violations of the U.S.-Bolivia BIT.  The

arbitration will be governed by the United Nations Commission on International Trade Law ("UNCITRAL") Arbitration Rules. Under Article 18 of the UNCITRAL Arbitration Rules, the place of arbitration will be determined by the tribunal, "having regard to the circumstances of the case." Petitioners intend to request that the arbitration be seated outside the United States; and because Mr. Orlandini is a U.S. citizen, Petitioners believe that Bolivia will concur with this request. Specifically, Petitioners intend to suggest Paris, France, a venue to which Bolivia has agreed for other UNCITRAL arbitrations with other investors.

18.     The UNCITRAL Arbitration Rules do not prohibit judicial discovery or assistance from courts. Article 27 of the UNCITRAL Arbitration Rules, titled "Evidence," provides that the arbitral tribunal "shall determine the admissibility, relevance, materiality and weight of the evidence offered." Ex. T, UNCITRAL Arbitration Rules (2013). In other UNCITRAL arbitrations, tribunals have accepted evidence obtained from court-supervised discovery proceedings such as under Section 1782.

19.     Sánchez de Lozada will not be a party to the arbitration.

20.     Once constituted, the arbitral tribunal will not have jurisdiction over Sánchez de Lozada and will not have authority to order Sánchez de Lozada to produce documents.

21.     There is no indication or reason to believe that the arbitral tribunal, once constituted, would be unreceptive to judicial assistance by Section 1782 discovery.

**The Discovery Needed**

22.     Petitioners need discovery from Sánchez de Lozada on COMSUR's incursion into CMO's concessions and the amount of minerals that COMSUR and COMIBOL extracted from CMO's concessions, including under the guise of the Seguridad I concession. Petitioners also seek information on wrongful acts that Sánchez de Lozada disclosed to Glencore during the sale of COMSUR, as well as any other relevant information that Sánchez de Lozada had in relation to

Petitioners' claims against Bolivia.  This discovery is for use by Petitioners to assist in proving liability and resulting damages against Bolivia in the arbitration.  The draft subpoena filed concurrently with the Petition describes Petitioners' discovery requests in full detail.

23.     Petitioners' request for discovery is not intended to, and does not in fact, circumvent any applicable foreign restrictions or policies on the gathering of evidence.

24.     Petitioners' request is not unduly burdensome or intrusive.  It seeks a discrete set of documents in Sánchez de Lozada's possession and deposition testimony of Sánchez de Lozada regarding issues of direct relevance to the upcoming international investment arbitration.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.  Executed on November 21, 2017, in Washington, D.C.

_____
David M. Orta